AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| TORAINO ANDRETTI WALKER | ) | 6:21-mj- 1030 |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 14, 2021 _____ in the county of _____ Orange _____ in the _____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) | Possession of a firearm in furtherance of a trafficking offense. |
| 21 U.S.C. § 841 | Possession with intent to distribute less than 500 grams of a mixture or substance containing a detectable amount of cocaine |

This criminal complaint is based on these facts:

Please see the attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael A. Drake, Task Force Officer - DEA
*Printed name and title*

Sworn to before me over ZOOM and signed by me pursuant to Fed.R.Crim. P. 4.1 and 4(d).

Date: 01/15/2021

_____
*Judge's signature*

City and state: _____ Orlando, Florida _____

EMBRY J. KIDD, U.S. MAGISTRATE
*Printed name and title*

**STATE OF FLORIDA**                    Case No. **6:21-mj-**1030

**COUNTY OF ORANGE**

### AFFIDAVIT

I, Michael A. Drake, Task Force Officer (TFO), U.S. Drug

Enforcement Administration (DEA), United States Department of Justice,

being duly sworn, state as follows:

### Introduction

1.      I make this affidavit in support of a criminal complaint for

Toraino Andretti WALKER (**WALKER**).  Based on the following facts, there

is probable cause to believe that **WALKER** has committed violations of 21

U.S.C. §§ 841(a)(1) and 841(b)(1)(C), specifically, possession with intent to

distribute less than 500 grams of a mixture or substance containing a

detectable amount of cocaine; and 18 U.S.C. § 924(c), possession of a firearm

in furtherance of a drug trafficking crime.

2.      The information set forth in this affidavit is based upon my own

personal knowledge as well as information provided to me by other law

enforcement officers and additional sources, identified in this affidavit and is

provided solely for the purpose of establishing probable cause in support of the

requested search warrant.  Because this affidavit is submitted for the limited

purpose of establishing such probable cause, it does not include all of the details of this investigation of which I am aware.

## Agent Background and Items to Be Seized

3.      I am presently employed by the Volusia County Sheriff's Office, Volusia County, Florida, and have been so since September, 2012. Prior to 2012, I was employed by the Ormond Beach Police Department, Volusia County, Florida, from June 1983 until January 2012. Between 1995 and 2005, I was assigned to the United States Department of Justice, Drug Enforcement Administration (DEA), Orlando District Office, as a Task Force Officer (TFO). Beginning in April, 2014, I was again assigned to the DEA in Orlando, Florida, where I currently am assigned as a TFO. During the course of my employment as a law enforcement officer, I have received specialized training in the area of narcotics investigations from various training schools, including the DEA Basic Narcotics Investigations Course. The training seminars and schools I have attended consisted of comprehensive classroom training in specialized narcotics investigative matters, including, but not limited to, drug interdiction, drug detection, money laundering techniques, locating hidden assets derived from narcotics trafficking, and the investigation of individuals involved in the smuggling, cultivation, manufacturing and illicit trafficking of controlled substances. In the course of my employment, I have

been involved in investigations of drug trafficking offenses and in the arrest of drug trafficking violators. Being duly sworn, I represent the following facts to the court:

### Probable Cause

4.    Toraino Andretti **WALKER** is currently a target of a DEA-led investigation related to the distribution of cocaine in and around Orlando, Florida. The investigation of **WALKER** started in August 2020 after agents received information from a cooperating source (CS-1) that **WALKER** was selling multi-ounce quantities of cocaine, pound quantities of marijuana, and "Molly" (MDMA) from his business, "The Moonlight", located at the 4522 Clarcona Ocoee Road, Orlando, Florida 33810. My investigation confirmed that **WALKER** used 4522 Clarcona Ocoee Road, Orlando, Florida 33810 to distribute cocaine, marijuana, and MDMA, and that he stored firearms that he uses as protection while selling cocaine, marijuana, and MDMA.

5.    In August 2020, CS-1[1] began providing DEA agents information concerning the drug trafficking activities of **WALKER**. CS-1 informed agents that WALKER owned and operated an unlicensed gambling hall named "The

---

[1] CS-1 has worked with law enforcement officers two previous times prior to his current cooperation. CS-1 is cooperating with agents in an attempt to assist CS-2 with his/her immigration status. CS-1 has previous convictions for sale/delivery of cocaine, aggravated fleeing/eluding, grand theft, and multiple suspended driver's license offenses. However, CS-1 does not have any pending charges and is not currently on any type of supervision from a court.

3

Moonlight" located at 4522 Clarcona Ocoee Road, Orlando, Florida 33810.
CS-1 described having purchased pound quantities of marijuana from
**WALKER** in the past. Additionally, CS-1 has seen **WALKER** selling multi-
ounce quantities of cocaine and pounds quantities of "Molly" (MDMA) from
inside of the business. CS-1 said that **WALKER** maintains these drugs inside
of a backpack inside of the business. CS-1 told agents that **WALKER** also
maintains possession of multiple firearms inside of the business. CS-1 said
**WALKER** has the firearms for protection. CS-1 has seen two handguns and
one rifle inside of the business. CS-1 described the handguns as being
revolvers and the rifle as an "AR-15" type weapon.

  6. On August 14, 2020, CS-1 was inside of 4522 Clarcona Ocoee
Road, Orlando, Florida 33810 at which time CS-1 asked **WALKER** how
much was he charging for an ounce of cocaine. According to CS-1,
**WALKER** told CS-1 that the cost was one thousand four hundred dollars per
ounce of cocaine.

  7. A search of law enforcement indices revealed that 4522 Clarcona
Ocoee Road, Orlando, Florida 33810 was owned by a LLC and that the
registered agent of the LLC was a female named B.N. Agents also found that
B.N. has the same home address listed on her Florida driver's license as

**WALKER**.  Agents showed CS-1 a photograph of B.N.  CS-1 told agents B.N. was **WALKER's** previous girlfriend.

8.      Beginning on September 22, 2020, agents started using CS-1 to make controlled purchases of cocaine from **WALKER**.  To date, agents have conducted five controlled purchases in which CS-1 has purchased cocaine, a combination of cocaine and MDMA, or a firearm from **WALKER**, with the last controlled purchase occurring on December 28, 2020.  During each transaction, CS-1 has met with **WALKER** and purchased one to four ounces of cocaine, one ounce of MDMA, and one firearm.  All five controlled purchases took place inside of 4522 Clarcona Ocoee Road, Orlando, Florida 33810.  At various times, CS-1 has physically been in all three sections of the building that this business encompasses.  All of the sections of the building are controlled by electronic locks that **WALKER**, or his employees, controls.  In addition, CS-1 also physically observed that all three sections of this building contained electronic gaming machines, card tables, and/or pool tables.

9.      On September 21, 2020, CS-1 called **WALKER** at the direction of agents in order to arrange the purchase of two ounces of cocaine.  CS-1 called telephone number 407-545-0375, which CS-1 had previously identified as being used by **WALKER**.  During the conversation, CS-1 requested that **WALKER** be ready for CS-1 the following day.  CS-1 told **WALKER** that

CS-1 was going to need "two" meaning that CS-1 wanted two ounces of cocaine. **WALKER** told CS-1 the price was now one thousand four hundred and fifty dollars per ounce. CS-1 agreed to the price and told **WALKER** he/she would meet with **WALKER** the following day. I monitored and recorded the telephone call between CS-1 and **WALKER**.

10.    On September 22, 2020, at approximately 1:53 p.m., CS-1 called **WALKER** at the direction of agents in order to arrange a meet location and time to purchase two ounces of cocaine from **WALKER**. CS-1 called telephone number 407-545-0375, which CS-1 had previously identified as being used by **WALKER**. During the conversation, CS-1 confirmed that CS-1 wanted to purchase two ounces of cocaine from **WALKER**. **WALKER** affirmed and CS-1 agreed to meet **WALKER** later that day at 4522 Clarcona Ocoee Road, Orlando, Florida 33810.

11.    On September 22, 2020, agents met with CS-1 and CS-2[2] at a pre-determined location, at which time agents searched CS-1, CS-2 and CS-2's vehicle and found all free of contraband. CS-2's role in the operation was to

---

[2] CS-2 has worked with law enforcement officers for approximately five years and is cooperating with agents in hopes of receiving assistance with his/her immigration status. CS-2 has two previous federal drug convictions involving cocaine and one previous state conviction for sale/delivery of marijuana. However, CS-2 does not have any pending offenses and is not currently on any type of supervision from a court.

drive CS-1 to the meet location and to act as the person CS-1 was buying the cocaine for. CS-1 was then provided with an audio listening and recording device and two audio/video recording devices for safety and evidentiary purposes. Additionally, agents provided CS-1 with three thousand dollars in Official Advanced Funds (OAF) to pay for the cocaine.

12.     Agents then followed CS-1 and CS-2 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810. Upon arrival, CS-2 parked the vehicle in front of the business and CS-1 exited the vehicle before entering 4522 Clarcona Ocoee Road, Orlando, Florida 33810. Once inside of the business, CS-1 met with **WALKER**. CS-1 confirmed that CS-1 wanted two ounces of cocaine. **WALKER** told CS-1 that he was going to go and pick up the cocaine from the area of Orange Center Boulevard, Orlando, Florida. CS-1 then exited 4522 Clarcona Ocoee Road, Orlando, Florida 33810 closely followed by **WALKER**. CS-1 entered CS-2's vehicle. A few minutes later **WALKER** approached the vehicle and briefly spoke with CS-2. **WALKER** then walked over to and entered the front passenger door of a blue 2016 BMW SUV bearing Florida license plate PLG***, which then departed the parking lot.

13.     Agents maintained surveillance of the blue BMW SUV and followed it to the area of **** Walden Circle, Orlando, Florida, where it arrived at approximately 6:06 p.m. Agents observed the BMW SUV park

7

before **WALKER** and an unidentified female exited the vehicle and walk

towards a breezeway of the apartment complex. A search of law enforcement

indices revealed that **WALKER's** Florida driver's license listed \*\*\*\* Walden

Circle, Apartment \*\*\*, Orlando, Florida 32811 as his home address.

14.     On September 22, 2020, at approximately 6:49 p.m., agents

observed **WALKER** and the unidentified female return to the BMW SUV

where **WALKER** entered the driver's door and the female entered the front

passenger door of the vehicle before it departed. Agents maintained

surveillance of the BMW SUV as it traveled in the direction of 4522 Clarcona

Ocoee Road, Orlando, Florida 33810. At approximately 7:02 p.m., agents

observed the BMW SUV enter the parking lot of a convenience store located

at John Young Parkway and Columbia Street, Orlando, Florida at which time

the unidentified female passenger exited the vehicle and entered another

vehicle that was in the parking lot. The BMW SUV then departed the parking

lot.

15.     On September 22, 2020, at approximately 7:09 p.m., agents

observed the BMW SUV pull into the driveway of a residence located on

South Ohio Avenue, Orlando, Florida and stop. Agents then observed an

unidentified male exit the driver's door of a silver van that was parked in front

of the residence and enter the front passenger door of the BMW SUV. The

unidentified male exited the BMW SUV and briefly returned to the parked silver van before returning to the BMW SUV. The unidentified male then exited the BMW SUV, which departed the residence at approximately 7:16 p.m.

16.     Agents maintained surveillance of the BMW SUV until it arrived at 4522 Clarcona Ocoee Road, Orlando, Florida 33810 at approximately 7:36 p.m. where CS-1 and CS-2 were waiting. Agents observed **WALKER** exit the driver's door of the BMW SUV and CS-1 exit CS-2's vehicle. CS-1 and **WALKER** met briefly in the parking lot before going inside of 4522 Clarcona Ocoee Road, Orlando, Florida 33810.

17.     On September 22, 2020, at approximately 7:41 p.m., agents observed CS-1 exit 4522 Clarcona Ocoee Road, Orlando, Florida 33810 and enter CS-2's vehicle. CS-1 and CS-2 then traveled to a pre-determined location while under surveillance of agents. Agents met with CS-1 and CS-2 and recovered the three recording devices, one hundred dollars in OAF, and two clear sandwich style baggies that contained a white chunk like substance. Agents tested the white chunk like substance which yielded a presumptive positive result for cocaine. The suspected cocaine was later submitted to the Southeast Laboratory for analysis. Agents again searched CS-1, CS-2 and CS-2's vehicle and found all free of contraband.

18.     During a debriefing of CS-1 after the operation, CS-1 told agents that when CS-1 first met with **WALKER** inside of the business on September 22, 2020, CS-1 observed what appeared to be an AR-15 leaning against the wall in a room just off of the main gambling room on the first floor. CS-1 described this room as being located at the front of the business and to the right of the front doors as you enter the first floor from the parking lot. CS-1 told agents that **WALKER** uses this room as his office, but that there is a bed located inside of the room where **WALKER** will often sleep. CS-1 stated that when **WALKER** returned to 4522 Clarcona Ocoee Road, Orlando, Florida 33810 they went inside where **WALKER** handed CS-1 the two plastic sandwich baggies with the suspected cocaine. CS-1 stated that **WALKER** originally had the cocaine wrapped inside of a towel that was in his hand. CS-1 then counted out two thousand nine hundred dollars and gave it to **WALKER**. I have reviewed the video captured from the audio/video recording devices provided to CS-1 prior to meeting with **WALKER**. I was able to see what appeared to be an AR-15 style rifle, or similar weapon, leaning against the wall as described by CS-1. In the video I was not able to see **WALKER** hand CS-1 the two sandwich baggies with the suspected cocaine, but I was able to hear **WALKER** and CS-1 discuss the transaction and see CS-1 give **WALKER** the money for the cocaine.

10

19.    On October 14, 2020, CS-1 called **WALKER** at the direction of agents in order to arrange the purchase of two ounces of cocaine.  CS-1 called telephone number 407-545-0375, which CS-1 had previously identified as being used by **WALKER**.  During the conversation, CS-1 requested that **WALKER** be ready for CS-1 the following day.  CS-1 told **WALKER** that CS-1 was going to need "two" meaning that CS-1 wanted two ounces of cocaine.  **WALKER** confirmed that CS-1 wanted the better quality cocaine at one thousand four hundred and fifty dollars per ounce.  CS-1 agreed to the price and told **WALKER** he/she would meet with **WALKER** the following day.  I monitored and recorded the telephone call between CS-1 and **WALKER**.

20.    On October 15, 2020, CS-1 and **WALKER** again communicated via telephone.  CS-1 agreed to meet with **WALKER** at 4522 Clarcona Ocoee Road, Orlando, Florida 33810 to complete the transaction.  **WALKER** indicated to CS-1 that he had to meet with his source for the cocaine before meeting with CS-1.

21.    On October 15, 2020, agents met with CS-1 and CS-2 at a pre-determined location, at which time agents searched CS-1, CS-2 and CS-2's vehicle and all free of contraband.  CS-1 was then provided with an audio listening and recording device and an audio/video recording device for safety

11

and evidentiary purposes. Additionally, agents provided CS-1 with three thousand eight hundred dollars to pay **WALKER** for the cocaine and potentially a firearm.

22.     Agents then followed CS-1 and CS-2 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810. Upon arrival, CS-2 parked the vehicle in front of the business where CS-1 and CS-2 waited for **WALKER's** arrival. At approximately 6:56 p.m., agents observed a blue BMW SUV arrive at the business. CS-1 then exited CS-2's vehicle and approached the BMW SUV. **WALKER** emerged from the BMW SUV before he and CS-1 entered 4522 Clarcona Ocoee Road, Orlando, Florida 33810.

23.     On October 15, 2020, at approximately 7:02 p.m., agents observed CS-1 exit 4522 Clarcona Ocoee Road, Orlando, Florida 33810 and enter CS-2's vehicle. CS-1 and CS-2 then traveled to a pre-determined location while under surveillance of agents. Agents met with CS-1 and CS-2 and recovered the recording devices, nine hundred dollars, and two clear sandwich style baggies that contained a white chunk like substance. Agents tested the white chunk like substance which yielded a presumptive positive result for cocaine. The suspected cocaine was later submitted to the Southeast Laboratory for analysis. Agents again searched CS-1, CS-2 and CS-2's vehicle and found all free of contraband.

24.    During a debriefing of CS-1 after the operation, CS-1 told agents that CS-1 first met with **WALKER** in the parking lot of 4522 Clarcona Ocoee Road, Orlando, Florida 33810 after **WALKER** arrived in a blue BMW.  CS-1 stated that **WALKER** removed a beige colored back pack and a fan from his vehicle before they entered the business.  Once inside of the business, CS-1 stated that they went into the front room which has the bed.  CS-1 observed **WALKER** remove a blue steel revolver with a brown wooden grip from his left pants pocket and place it on a cooler.  CS-1 stated the beige colored back pack was also located on the cooler.  CS-1 observed **WALKER** remove two baggies containing the suspected cocaine from the beige colored back pack.  CS-1 took possession of the two baggies of suspected cocaine and later turned them over to agents.  CS-1 then counted out two thousand nine hundred dollars and gave it to **WALKER**.  I have reviewed the video captured from the audio/video recording devices provided to CS-1 prior to meeting with **WALKER**.  I was able to see **WALKER** in possession of the blue steel revolver described by CS-1, the suspected cocaine, and the money CS-1 provided to **WALKER**.

25.    CS-1 engaged **WALKER** in conversation about firearms to determine if **WALKER** possessed a firearm to be sold.  **WALKER** told CS-1 that the firearms he had were for his protection and inquired what type of

13

firearm CS-1 was looking to purchase.  CS-1 told **WALKER** he/she was looking to buy a rifle.

26.     Between October 21, 2020 and October 28, 2020, CS-1 communicated with **WALKER** several times at the direction of agents in order to arrange the purchase of four and a half ounces of cocaine.  **WALKER** used telephone number 407-545-0375.  During the conversations, CS-1 told **WALKER** that CS-1 wanted to purchase four and a half ounces of cocaine. **WALKER** told CS-1 that the price of the cocaine had gone up and that it was now one thousand five hundred dollars per ounce.  CS-1 and **WALKER** agreed to meet on October 28, 2020 to complete the transaction.  On October 28, 2020, CS-1 and **WALKER** spoke again on the telephone.  CS-1 told **WALKER** that CS-1 did not have enough money due to the price increase and requested to purchase four ounces of cocaine at a cost of six thousand dollars.  **WALKER** agreed to meet CS-1 later that date at 4522 Clarcona Ocoee Road, Orlando, Florida 33810 to complete the transaction.

27.     On October 28, 2020, agents met with CS-1 and CS-2 at a pre-determined location, at which time agents searched CS-1, CS-2 and CS-2's vehicle and all free of contraband.  CS-1 was then provided with an audio listening and recording device and two audio/video recording devices for safety and evidentiary purposes.  Additionally, agents provided CS-1 with six

thousand five hundred and twenty five dollars in OAF to pay **WALKER** for the cocaine.

28.     Agents then followed CS-1 and CS-2 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810.  Upon arrival, CS-2 parked the vehicle in front of the business at which time CS-1 exited the vehicle and entered the business at approximately 8:10 p.m.

29.     On October 28, 2020, at approximately 8:15 p.m., agents observed CS-1 exit 4522 Clarcona Ocoee Road, Orlando, Florida 33810 and enter CS-2's vehicle.  CS-1 and CS-2 then traveled to a pre-determined location while under surveillance of agents.  Agents met with CS-1 and CS-2 and recovered the recording devices, five hundred and twenty five dollars in OAF, and a clear sandwich style baggie that contained a white chunk like substance. Agents tested the white chunk like substance which yielded a presumptive positive result for cocaine.  The suspected cocaine was later submitted to the Southeast Laboratory for analysis.  Agents again searched CS-1, CS-2 and CS-2's vehicle and found all free of contraband.

30.     During a debriefing of CS-1 after the operation, CS-1 told agents upon arriving at 4522 Clarcona Ocoee Road, Orlando, Florida 33810, CS-1 observed **WALKER's** vehicle parked in front of the business.  CS-1 then walked to the front door where **WALKER** let CS-1 inside.  Once inside of the

business, CS-1 stated that they went into the front room which has the bed. CS-1 observed a blue steel revolver with a brown wooden grip on the bed along with a plastic baggie containing the suspected cocaine. CS-1 took possession of the plastic baggie containing the suspected cocaine and later turned it over to agents. CS-1 then counted out six thousand dollars and gave it to **WALKER** which **WALKER** then counted. CS-1 asked about purchasing one of **WALKER's** firearms. **WALKER** again told CS-1 that he would not sell them, but would look to find CS-1 a firearm. Additionally, CS-1 told **WALKER** that CS-2 wanted to have a conversation with **WALKER** at a later date. I have reviewed the video captured from the audio/video recording devices provided to CS-1 prior to meeting with **WALKER**. I was able to see the blue steel revolver described by CS-1, the suspected cocaine, and the money CS-1 provided to **WALKER**.

31.     Between October 29, 2020 and November 4, 2020, CS-1 communicated with **WALKER** several times at the direction of agents in order to arrange a meeting between CS-2 and **WALKER**. **WALKER** used telephone number 407-545-0375. During the conversations, **WALKER** indicated to CS-1 that if they were to buy more cocaine the price would be less. **WALKER** also indicated that he had spoken to someone who had given him a price of forty eight. CS-1 and agents understood this to mean that

16

**WALKER** would sell CS-1 and CS-2 a kilogram of cocaine for forty eight thousand dollars. CS-1 and **WALKER** agreed to meet on November 4, 2020. WALKER agreed to meet CS-1 later that date at 4522 Clarcona Ocoee Road, Orlando, Florida 33810.

32.     On November 4, 2020, agents met with CS-1 and CS-2 at a pre-determined location, at which time agents searched CS-1, CS-2 and CS-2's vehicle and all free of contraband. CS-1 was then provided with an audio listening and recording device and an audio/video recording device for safety and evidentiary purposes. Additionally, agents provided CS-2 with an audio/video recording device for safety and evidentiary purposes.

33.     Agents then followed CS-1 and CS-2 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810. Upon arrival, CS-2 parked the vehicle in front of the business at which time CS-1 and CS-2 exited the vehicle and entered the business at approximately 6:27 p.m.

34.     On November 4, 2020, at approximately 6:57 p.m., agents observed CS-1 and CS-2 exit 4522 Clarcona Ocoee Road, Orlando, Florida 33810 and enter CS-2's vehicle. CS-1 and CS-2 then traveled to a pre-determined location while under surveillance of agents. Agents met with CS-1 and CS-2 and recovered the recording devices. Agents again searched CS-1, CS-2 and CS-2's vehicle and found all free of contraband.

17

35.    During a debriefing of CS-1 and CS-2 after the operation, the CS's told agents upon arriving at 4522 Clarcona Ocoee Road, Orlando, Florida 33810, they went inside of the first floor of the business where they met with **WALKER**.  **WALKER** initially showed CS-2 around the business to include the second floor.  While upstairs, CS-1 asked **WALKER** about their previous telephone calls.  **WALKER** indicated to the CS's that he could purchase one kilogram of cocaine and provide it to the CS's at a cost of forty eight thousand dollars.  CS-2 asked **WALKER** if he could do better on the price and **WALKER** stated he would have to check.  **WALKER** further explained that the CS's would not have to provide him with the money prior to **WALKER** picking up the cocaine.  **WALKER** and the CS's agreed to talk later.  I have reviewed the video captured from the audio/video recording devices provided to CS-1 and CS-2 prior to meeting with **WALKER**.  The CS's description of the meeting with **WALKER** was found to be accurate.

36.    On November 17, 2020, Magistrate Judge Gregory J. Kelly, Middle District of Florida in Orlando, signed an order authorizing the search of 4522 Clarcona Ocoee Road, Orlando, Florida 32810.[3]

---

[3] I did not execute this search warrant because **WALKER** became suspicious of CS-2 and declined to complete the sale of the one kilogram of cocaine to CS-1 and CS-2 on November 19, 2020.

18

37.    On November 18, 2020, CS-1 called **WALKER** at the direction of agents in order to arrange the purchase of one kilogram of cocaine.  CS-1 called telephone number 407-545-0375, which CS-1 had previously identified as being used by **WALKER**.  **WALKER** initially did not answer, but called CS-1 back a short time later.  During the conversation, CS-1 told **WALKER** that CS-1 would be bringing the money tomorrow.  **WALKER** asked CS-1 what CS-1 wanted **WALKER** to do.  CS-1 told **WALKER** to get "it" for me referring to cocaine.  **WALKER** wanted to know how far CS-1 wanted him to go and CS-1 replied, "All the way".  **WALKER** told CS-1 that he thought CS-1 had been "bullshitting" him and that CS-1 was just trying to get some money out of "him", referring to CS-2.  CS-1 assured **WALKER** he/she was serious.  **WALKER** said, "Alright, I'll talk to you."  CS-1 and agents understood this to mean that **WALKER** agreed to sell CS-1 one kilogram of cocaine and would be waiting to hear from CS-1 when he/she had the money.

38.    On November 19, 2020, at approximately 8:00 a.m., CS-1 received a text message from **WALKER**, who was using telephone number 407-545-0375.  The message read, "Bro I'm up so hit me when you ready to move".  CS-1 and agents understood this to mean that **WALKER** was waiting to hear from CS-1 and that he was ready to complete the sale of the cocaine to CS-1.

39.    On November 19, 2020, at approximately 4:57 p.m., CS-1
received a telephone call from **WALKER**, who was using telephone number
407-545-0375.  Prior to this call, CS-1 had attempted to call **WALKER** two
times at the direction of agents, but the calls went unanswered.  CS-1 told
**WALKER** that CS-2 was with CS-1 and that CS-1 had the money.
**WALKER** informed CS-1 that he would need the money in order for him to
pick up the cocaine.  CS-1 told **WALKER** that he/she would have to call
**WALKER** back.  This was the first of four calls between CS-1 and **WALKER**
on the evening of November 19, 2020.

40.    During the three subsequent calls between CS-1 and **WALKER**,
**WALKER** affirmed that he would need the money prior to being able to pick
up the cocaine.  **WALKER** also said that he would have to speak with his
source to determine if they had a kilogram of cocaine available.  During the
fourth and final call, CS-1 and CS-2 spoke to **WALKER**.  CS-2 told
**WALKER** he had told the CS's during their meeting on November 4, 2020,
that they would not need to provide the money to **WALKER** in order for him
to pick up the cocaine.  **WALKER** again said he would contact his source of
supply to see if they had the full amount and he would call the CS's back.

41.    On November 19, 2020, at approximately 6:20 p.m., CS-1
received a text message from **WALKER** who was using telephone number

407-545-0375. The message read, "Bro u know I ain't been in that loop in yrs I just told Dread yeah bc u said you wanted me to vouch for you so he would give you at least 24 but he not letn that money go so it's not gonna hapn so just tell him my people can't get it". CS-1 and agents understood this to mean that **WALKER** was not willing to conduct the transaction without having been provided twenty four thousand dollars in advance, or half the value of the cocaine. All telephone calls between **WALKER** and the CS's were monitored and recorded by agents.

42.     On November 20, 2020, CS-1 contacted and informed me that CS-1 had met with **WALKER** inside of 4522 Clarcona Ocoee Road, Orlando, Florida, at approximately 10:30 p.m. on November 19, 2020. CS-1 stated that **WALKER** had CS-1 come into the front room with the bed. **WALKER** told CS-1 that he had become "scared" earlier that evening while on the telephone with CS-1 and CS-2. **WALKER** said that he had heard somethings about CS-2 cooperating with law enforcement years earlier.

43.     According to CS-1, **WALKER** had a female employee come into the bedroom and describe what she had seen the night of the first cocaine transaction involving CS-2, which would have been September 22, 2020. The female employee indicated she had been across the street from 4522 Clarcona Ocoee Road, Orlando, Florida after having been dropped off. She stated that

21

she observed some "undercover" vehicles in the parking lot. CS-1 understood this to mean she had seen unmarked law enforcement vehicles parked across from **WALKER's** business. CS-1 advised that **WALKER** never appeared concerned about whether or not CS-1 was working with law enforcement and never said anything about not having CS-2 around in the future.

44.     On November 26, 2020, at approximately 1:54 p.m., CS-1 called me to advise he/she had just received a telephone call from **WALKER**. CS-1 said **WALKER** called from telephone number 407-545-0375. During the call, **WALKER** told CS-1 that he had "Molly" available for sale. **WALKER** wanted to know if a family member of CS-1's might be interested in buying some "Molly". I know the word "Molly" is street slang for MDMA. CS-1 told **WALKER** he/she would check and let **WALKER** know. This call was not monitored or recorded.

45.     On December 7, 2020, at approximately 8:17 p.m., CS-1 called **WALKER** at the direction of agents in order to arrange the purchase of one ounce of cocaine and one ounce of MDMA, a.k.a. "Molly". CS-1 called telephone number 407-545-0375. **WALKER** initially did not answer CS-1's call or the two additional attempts made by CS-1. At approximately 10:09 p.m., CS-1 received a call from **WALKER** from telephone number 407-545-0375. During the conversation, CS-1 told **WALKER** he/she needed one of

each. **WALKER** requested CS-1 clarify what CS-1 wanted. CS-1 said that he/she needed one of the "white", referring to cocaine, and one "Molly", referring to MDMA. **WALKER** agreed to the transaction. I monitored and recorded the telephone call between CS-1 and **WALKER**.

46.     According to CS-1, on December 8, 2020, CS-1 received a telephone call from **WALKER** who was using telephone number 407-545-0375. **WALKER** wanted to know if CS-1 was ready to conduct the transaction for the cocaine and the MDMA. CS-1 informed **WALKER** he/she would not be ready until later that date. CS-1 and **WALKER** agreed to talk later that day. This call was not monitored or recorded.

47.     On December 8, 2020, at approximately 5:00 p.m., agents instructed CS-1 to call **WALKER** at telephone number 407-545-0375. The purpose of the call was inform **WALKER** that CS-1 was ready to meet to purchase the cocaine and MDMA. During the call, **WALKER** agreed and indicated to CS-1 he was going to contact his source and then call CS-1 back. This was the first of several conversations between CS-1 and **WALKER** in an attempt to arrange the transaction. I monitored and recorded all of the conversations.

48.     Shortly after hanging up after talking with WALKER, CS-1 received a text message from **WALKER** on his/her phone. The message

read, "U by yourself?" CS-1 replied, "Yes". I photographed the text messages and later secured the photograph into evidence. CS-1 and **WALKER** continued to communicate via voice calls and text messages over an approximately two and a half hour period in which **WALKER** informed CS-1 he was attempting to contact his source of supply. At one point in time, **WALKER** stopped answering CS-1's calls and text messages.

49.    Believing that **WALKER** had gone back to sleep, agents had CS-1 send **WALKER** a text message. CS-1's text message read, "Bruh you done fall asleep". **WALKER** did not initially respond and the CS departed the meet location.

50.    On December 8, 2020, at approximately 8:35 p.m., CS-1 received a text message from **WALKER** that read, "No I'm moving now but I will call you when I'm 15 minutes away".

51.    On December 8, 2020, agents met with CS-1 at a pre-determined location at which time agents searched CS-1 and CS-1's vehicle and all were found free of contraband. CS-1 was then provided with an audio listening and recording device and two audio/video recording devices for safety and evidentiary purposes. Additionally, agents provided CS-1 with two thousand dollars in OAF to pay **WALKER** for the cocaine and MDMA.

52.     Agents then followed CS-1 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810.  Upon arrival, CS-1 parked the vehicle in front of the business at which time CS-1 exited the vehicle and entered the business at approximately 8:50 p.m.

53.     On December 8, 2020, at approximately 8:53 p.m., agents observed CS-1 exit 4522 Clarcona Ocoee Road, Orlando, Florida 33810 and enter CS-1's vehicle.  CS-1 then traveled to a pre-determined location while under surveillance of agents.  Agents met with CS-1 and recovered the three recording devices, three hundred fifty dollars, and two clear sandwich style baggies.  One baggie contained a white chunk like substance and the second baggie contained a beige chunk like substance.  Agents tested the contents of both baggies.  The white chunk like substance yielded a presumptive positive result for cocaine and the beige chunk like substance yielded a presumptive positive result for MDMA.  The suspected cocaine and MDMA were later submitted to the Southeast Laboratory for analysis.  Agents again searched CS-1 and CS-1's vehicle and found both free of contraband.

54.     During a debriefing of CS-1 after the operation, CS-1 told agents that CS-1 first met with **WALKER** just inside the business after an employee of **WALKER's** let CS-1 inside.  CS-1 followed **WALKER** into the front room with the bed located off of the main room.  Once inside of the room

WALKER handed CS-1 two clear plastic baggies that WALKER had in his hand. WALKER told CS-1 that the cost of the "Molly" was one hundred and fifty dollars. CS-1 then handed WALKER one thousand five hundred and fifty dollars in exchange for the cocaine and "Molly". WALKER counted the money and told CS-1 that he/she was short a hundred dollars. CS-1 then gave WALKER another one hundred dollars. CS-1 advised he/she then left the business, entered CS-1's vehicle, where CS-1 placed the two plastic baggies on top of the center console, and then drove to the pre-determined meet location and met with agents.

55.     On December 25, 2020, at approximately 10:54 p.m., CS-1 received two text messages from WALKER, who was using telephone number 407-480-1468. CS-1 advised agents he/she knew this to be WALKER's second telephone. The first text message was a photograph of an AR-15 style rifle with two magazines in a carrying case. The second text message read; "They asking 1500 for everything but it's the holidays so they may drop the num." CS-1 understood this to mean that WALKER had located a firearm to sell to CS-1 for $1,500.00. A photograph of the text messages was taken and later placed into evidence.

56.     CS -1 advised agents that on December 26, 2020, CS-1 spoke to WALKER while inside WALKER's business located at 4522 Clarcona Ocoee

Road, Orlando, Florida. CS-1 told **WALKER** that CS-1 was interested in purchasing the rifle, but would not have the money to purchase the firearm until December 28, 2020. **WALKER** agreed to complete the transaction on that date.

57.     On December 27, 2020, at approximately 10:52 a.m., CS-1 called **WALKER** at telephone number 407-545-0375 in order to confirm that the rifle was still available to be sold. **WALKER** told CS-1 that he did not currently have the rifle, but that he could get it when CS-1 was ready to complete the transaction. CS-1 confirmed with **WALKER** that CS-1 would be ready the following day.

58.     On December 28, 2020, at approximately 9:05 a.m., at the direction of agents CS-1 attempted to contact **WALKER** at telephone number 407-545-0375. The call went unanswered. CS-1 attempted to contact **WALKER** four additional times at the same telephone number, before **WALKER** answered at approximately 12:31 p.m. **WALKER** told CS-1 that he had not been able to talk with the person that had the rifle due to the person's telephone going to voice mail. **WALKER** indicated that he would continue to attempt to contact the person, and would contact CS-1 once he (**WALKER**) was in possession of the rifle.

59.     On December 28, 2020, at approximately 2:20 p.m., CS-1 called **WALKER** at telephone number 407-545-0375.  During the conversation **WALKER** indicated to CS-1 that he had not been able to talk with the person with the rifle and the telephone was still going to voice mail.  Agents did not have CS-1 make any additional attempts to contact **WALKER** on December 28, 2020.

60.     On December 29, 2020, CS-1 advised agents that he/she had gone to **WALKER's** club located at 4522 Clarcona Ocoee Road, Orlando, Florida during the evening hours of December 28, 2020.  The purpose of CS-1's visit to the club was to play dominos.  CS-1 told agents that sometime after midnight **WALKER** indicated to CS-1 that he had the AR-15 style rifle in his possession.  **WALKER** and CS-1 went into the front room of the business that has the bed at which time **WALKER** showed CS-1 the rifle.  As **WALKER** was showing CS-1 the rifle, CS-1 was having difficulty opening and closing the bolt of the rifle.  CS-1 then observed **WALKER** retrieve a second AR-15 style rifle, which was being stored in the space above the drop down ceiling.  CS-1 indicated that **WALKER** did this in order to provide CS-1 with a demonstration on how to open and close the bolt.  CS-1 said that **WALKER** wanted to conduct the sale of the rifle at that time, but CS-1 told **WALKER**

he/she did not have the money to complete the transaction. **WALKER** and CS-1 agreed to meet later that date to complete the sale.

61. On December 29, 2020, at approximately 3:24 p.m., at the direction of agents CS-1 attempted to call **WALKER** at telephone number 407-545-0375, but **WALKER** did not answer. At approximately 3:29 p.m., CS-1 received a telephone call from 407-545-0375, but was unable to answer the call before it went to voice mail. Immediately after this call, CS-1 received a telephone call from **WALKER** via CS-1's secondary telephone. **WALKER** was calling from telephone number 407-545-0375. CS-1 told **WALKER** he/she had the money and requested to meet with **WALKER**. **WALKER** directed CS-1 to meet him at 4522 Clarcona Ocoee Road, Orlando, Florida. This conversation was not recorded or monitored by agents.

62. On December 29, 2020, at approximately 3:33 p.m., CS-1 called **WALKER** at telephone number 407-545-0375. During the conversation, CS-1 asked if **WALKER** was able to get the seller of the gun to lower the price. **WALKER** indicated to CS-1 that he had not tried to negotiate a lower price.

63. On December 29, 2020, at approximately 3:37 p.m., agents met with CS-1 at a pre-determined location at which time agents searched CS-1 and CS-1's vehicle and all were found free of contraband. CS-1 was then provided with an audio listening and recording device and two audio/video

.

recording devices for safety and evidentiary purposes.  Additionally, agents provided CS-1 with one thousand five hundred dollars in OAF to pay **WALKER** for the rifle.

64.     Agents then followed CS-1 to 4522 Clarcona Ocoee Road, Orlando, Florida 33810.  Upon arrival, CS-1 parked the vehicle in front of the business at which time CS-1 exited the vehicle and walked up to the front of the business 4:17 p.m.

65.     On December 29, 2020, at approximately 4:18 p.m., CS-1 called **WALKER** at telephone number 407-545-0375 to inform **WALKER** he/she was outside of the business.

66.     On December 29, 2020, at approximately 4:20 p.m., agents observed CS-1 exit the parking lot of 4522 Clarcona Ocoee Road, Orlando, Florida 33810.  CS-1 then traveled to a pre-determined location while under surveillance of agents.  Agents met with CS-1 and recovered the three recording devices and a black gun case containing a multi caliber American Tactical, Model Omni Hybrid, rifle, with a serial number of NS050914.  The black gun case also contained two thirty (30) round magazines.  Agents again searched CS-1 and CS-1's vehicle and found both free of contraband.

67.     During a debriefing of CS-1 after the operation, CS-1 told agents that when CS-1 arrived at the business he/she found the front doors locked.

CS-1 stated that he/she called **WALKER** who then let CS-1 inside.  CS-1 met

with **WALKER** in the front room with the bed located off of the main room.

Once inside of the room **WALKER** handed CS-1 the previously described

black gun case.  CS-1 then handed **WALKER** one thousand five hundred

dollars in exchange for the rifle.  **WALKER** counted the money.  CS-1

advised he/she then left the business and placed the black gun case in the rear

of CS-1's vehicle, and then drove to the pre-determined meet location and met

with agents.

68.    On January 11, 2021, Magistrate Judge Embry J. Kidd, Middle

District of Florida in Orlando, signed an order authorizing the search of 4522

Clarcona Ocoee Road, Orlando, Florida.

69.    On January 13, 2021, at approximately 8:00 p.m., CS-1 called

**WALKER**, at the direction of agents, at telephone number 407-545-0375.

During the conversation CS-1 told **WALKER** that CS-1 wanted to purchase

four ounces of cocaine on the following day.  **WALKER** confirmed that the

price of the cocaine would be the same as last time which was one thousand

five hundred dollars per ounce.  **WALKER** told CS-1 that he wanted to

conduct the transaction earlier on the following day.

70.    On January 14, 2021, at approximately 8:30 a.m., agents

established surveillance of **WALKER's** residence located at **** Walden

Circle, Apartment *** Orlando, Florida 32811; and of **WALKER's** vehicle, a black 2016 Chevrolet Suburban bearing Florida license plate PLG***, which was parked in the roadway in front of **WALKER's** apartment complex.

71.     On January 14, 2021, at approximately 10:44 a.m., at the direction of agents, CS-1 called **WALKER** at telephone number 407-545-0375 in an attempt to arrange a meeting to purchase the cocaine. **WALKER** did not initially answer the calls. At approximately 11:08 a.m., **WALKER** answered CS-1's third attempt. **WALKER** indicated that he had to call the source of supply of the cocaine and would call CS-1 back.

72.     On January 14, 2021, at approximately 11:43 a.m., CS-1 called **WALKER** at telephone number 407-545-0375. **WALKER** indicated to CS-1 that he was waiting for his source of supply to call him back. CS-1 and **WALKER** agreed to meet at 4522 Clarcona Ocoee Road, Orlando, Florida to conduct the transaction. These calls were monitored and recorded by agents.

73.     On January 14, 2021, at approximately 12:15 p.m., agents observed **WALKER** approach and enter his black 2016 Chevrolet Suburban. **WALKER** was observed to be alone and carrying a back pack style bag. Agents maintained surveillance of **WALKER** as he traveled in the direction of 4522 Clarcona Ocoee Road, Orlando, Florida. Agents then observed **WALKER** pull into the driveway of a residence in Orlando, Florida. Agents

observed an unidentified male meet with **WALKER** for a short period of time. The unidentified male then went back inside of the residence before **WALKER** was observed backing out of the driveway. **WALKER** then continued driving towards 4522 Clarcona Ocoee Road, Orlando, Florida. Agents had previously observed **WALKER** meeting with an unidentified male at this same residence prior to meeting with CS-1 and selling CS-1 cocaine. I believe that when **WALKER** met with the unidentified male on January 14, 2021, he picked up the four ounces of cocaine that he was intending to sell to CS-1.

74.    Agents had made arrangements to have members of the Orlando Police Department attempt a traffic stop of **WALKER** and his vehicle prior to reaching 4522 Clarcona Ocoee Road, Orlando, Florida. Orlando Police Officers Brad Corbitt and Jeff Staudenmaier observed that **WALKER's** vehicle appeared to have illegal tint and was following too closely to a vehicle traveling in the same direction in front of him, both violations of Florida Statutes. Officers Corbitt and Staudenmaier, who were driving an unmarked vehicle equipped with emergency lights and siren, conducted a traffic stop of **WALKER's** vehicle in the area of John Young Parkway and Judge Drive in Orlando, Florida. **WALKER** was identified as the driver and sole occupant of the vehicle.

75.     Officer Corbitt made contact with **WALKER** from the front passenger side window.  During the initial contact, Officer Corbitt asked **WALKER** if he was in possession of any weapons and or narcotics. **WALKER** told officers that he had a firearm inside of the center console and then said that he had cocaine in the vehicle before pointing to a brown beanie cap in the cup holder in the center console.  Officer Staudenmaier then asked **WALKER** to step from the vehicle.  **WALKER** was searched and found free of any contraband or weapons before being asked to stand with officers at their vehicle.

76.     Orlando Police Officers Nicholas Metzger and Luke Austin then conducted a search of **WALKER's** vehicle.  Officer Austin found a clear plastic baggie, which contained eight smaller plastic bags further containing a white chunk like substance suspected to be cocaine in a brown beanie cap inside the cup holder as previously identified by **WALKER**.  Agents later tested the white chunk like substance which yielded a presumptive result for cocaine. Additionally, Officer Austin located a back pack style bag on the floorboard between the back second row seats.  Inside of the bag, Officer Austin found a box of Hornady brand 38 caliber ammunition.  The box was found to have nineteen (19) rounds of Hornady 38 SPL inside.  Officer Metzger searched the center console of the vehicle and found a Smith and

Wesson brand 357 magnum revolver, blue steel with brown handle, serial number ADL3428 located on the bottom of the handle and serial number 13172 located inside by the cylinder. The firearm was found to be loaded with six (6) Hornady 38 SPL bullets.   The cocaine, firearm and ammunition were later seized by agents and are being maintained as evidence.

77.     On January 14, 2021, at approximately 3:15 p.m., DEA agents executed the search warrant at 4522 Clarcona Ocoee Road.  There were five individuals found inside of the business.  All five of the individuals claimed to work in some capacity at the business.

78.     During the search, agents found three (3) semi-automatic firearms, one AR-15 style rifle, multiple scales, multiple bags of suspected cocaine, marijuana, MDMA (Molly), and Ecstasy.  A large portion of the drugs were found to be packaged for resale.  All items were found above a drop down ceiling in a room which contained a bed, a television to monitor the security cameras and a file cabinet.  All items were seized as evidence.

79.     **WALKER** was present during the execution of the search warrant and was placed under arrest at the conclusion of the search.

## Conclusion

80.     Based on the foregoing facts and opinions, my experience and training, and consultation with other law enforcement agents experienced in

drug investigations, I believe that there is probable cause to believe that on

January 14, 2021, Toraino Andretti **WALKER** has committed a violation of

21 U.S.C. §§ 841(a)(1) and (b)(1)(C), specifically, possession with intent to less

than 500 grams of a mixture or substance containing a detectable amount of

cocaine, as well as a violation of 18 U.S.C., § 924(c), possession of a firearm in

furtherance of a drug trafficking offense.

Michael A. Drake, Task Force Officer
Drug Enforcement Administration


Affidavit submitted by email and attested
to me as true and accurate by Zoom consistent with
Fed. R. Crim. P. 4.1 and 41(d)(3)
this __15__ day of January 2021.


EMBRY J. KIDD
United States Magistrate Judge